IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF SOUTH CAROLINA

In re:

Mairec Precious Metals U.S., Inc.,[1]

        Debtor.

Chapter 11

Case No. 19-01198-hb

**DECLARATION OF DAVID BAKER, CHIEF RESTRUCTURING OFFICER, IN SUPPORT OF CHAPTER 11 PETITION AND CERTAIN FIRST MOTIONS**

    I, **David Baker**, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

    1.    On the date hereof (the "Petition Date"), Mairec Precious Metals U.S., Inc. ("Mairec U.S." or the "Debtor") filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of South Carolina (the "Court"). The Debtor is operating its business as a debtor-in-possession under §§ 1107(a) and 1108 of the Bankruptcy Code.

    2.    I submit this Declaration to provide an overview of the Debtor's business and operations and this Chapter 11 case, as well as in support of the Debtor's bankruptcy petition and its request to obtain certain other "first day" relief (the "First Day Motions") as set forth in the pleading filed concurrently herewith.

    3.    I am authorized to submit this Declaration on behalf of the Debtor. This Declaration is being made pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

---

[1] The last four digits of the Debtor's tax identification number are 0569. The address of the Debtor's corporate headquarters is 230 Old Converse Road, Spartanburg, South Carolina, 29307.

4. I am over the age of 18 and authorized to submit this Declaration on the Debtor's behalf. If called upon to testify, I could and would testify competently to the facts set forth herein.

5. I am the founder and Managing Partner of Aurora Management Partners ("Aurora"). Since founding Aurora, I have managed a wide variety of turnaround and bankruptcy engagements involving both domestic and international operations in industries including steel, recycling, stamping, tier 1 and tier 2 automotive suppliers, tool and die manufacturers, textiles, safety equipment, construction, and others. In this capacity, I have served as Chief Restructuring Officer, Federal Receiver, State Receiver, and financial advisor to debtors and creditors' committees in over 20 states. I am a CTP and received two National Turnaround of the Year awards recognizing my work.

6. On January 15, 2019, I was retained to serve as the Debtor's Chief Restructuring Officer ("CRO") by its Board of Directors. Since that time, I met and consulted with the Debtor's then existing management and staff extensively. I then took over the management of the Debtor's day to day operations. I report to the newly appointed Independent Board of Directors comprised of Ralph Strayhorn, III, Michael A. Almond, and Matthew R. Kahn whom were appointed as independent members by the prior Board.

    a. Mr. Strayhorn has 35 years of experience in banking and finance having served (i) as an executive officer of five community banks, (ii) on the board of directors of four of those banks, and (iii) as President & CEO of three banks. He has successfully executed corporate restructurings, private equity placements and mergers. From May 2009 to the present, Mr. Strayhorn has been engaged by 10+ "troubled" banks or bank holding companies under regulatory enforcement actions as a strategic adviser to their management and boards of directors. He has never owned stock in Mairec or served on the Board, and is disinterested

    b. Mr. Almond is the founder and CEO of Antaeus Consulting, LLC. He is a retired attorney and a member of the North Carolina Bar for the last 43 years. He was a partner at the firm of Parker Poe, Adams & Bernstein LLC, a member of the

2

        Board of Directors for the Federal Reserve Bank of Richmond, Charlotte Branch, the President & CEO of the Charlotte Regional Partnership, Inc., and Executive Director of the Charlotte Regional Collaborative for a Global Economy. Mr. Almond was awarded the Knight's Cross of the Order of Merit by the President of the Federal Republic of Germany for outstanding commitment in fostering the relations between the United States and Germany. He has never owned stock in Mairec or served on the Board, and is disinterested

    c. Mr. Kahn is the founder of MRSKAHN, LLC and a Certified Public Accountant. He is the former CFO of Jos A Bank (NASDAQ: JOSB) and a former Principal and Managing Director of Gordon Brothers Group – GB Merchant Partners, LLC. He currently serves, or previously served, on boards including Samuels Jewelers, Thigs Remembered, Approach Resources, Hovensa LLC and others. He has 25+ years' experience in corporate finance, restructuring, corporate governance and bankruptcy. He has never owned stock in Mairec or served on the Board, and is disinterested.

    7.    Since taking over as CRO, I have been overseeing and advising all aspects of the Debtor's accounting, day-to-day operations, reporting, budgets, forecasts, cash flows, and, more recently, overall turnaround and sale efforts. I am therefore familiar with the Debtor's business, financial affairs, books and records, as well as the facts and circumstances surrounding the Debtor's chapter 11 filing and restructuring strategy.

    8.    Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, discussions with current and/or former members of the Debtor's senior management and professional advisors, information and materials that the Debtor's personnel, officers, and advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision and my direction in preparing this Declaration, or my opinion based upon my past experience and knowledge of the Debtor's operations and financial condition.

    9.    Part I of this Declaration provides a general background of the Debtor's business, operations, and capital structure; Part II describes the circumstances giving rise to the commencement of this Chapter 11 case; Part III describes the Debtor's proposed course for this Chapter 11 case; and Part IV sets forth certain facts in support of the First Day Motions.

## I. General Background

### A. Summary of Business and Operations

10. Mairec Edelmetallgesellschaft mbH ("Mairec Germany") was founded in 2003 as a three-person operation in the garage of Julia and Thomas Maier (together, the "Maiers"), a wife and husband residing in Germany. Over the past 15 years, Mairec Germany became an internationally successful recycling company with approximately 160 employees working from a state of the art facility in Alzenau, Germany.

11. As one of the leading international companies in precious metals recycling, Mairec Germany has continuously offered its customers the highest possible standards in sampling and value determination and the highest possible accuracy of work, while at the same time, the fastest possible processing speed. Mairec Germany was named to "Bayerns Best 50" in 2014, and "Top-Innovator" in 2017.

12. Seeking to capitalize on its success abroad, Mairec Germany formed the Debtor (a South Carolina corporation) as a U.S. subsidiary located in Spartanburg, South Carolina. Since its formation in 2015, the Debtor has also specialized in the recovery of precious metals—platinum, palladium, rhodium, and gold—from discarded materials containing such precious metals. The Debtor collects and recycles an assortment of scrap metal, including catalytic converters, sweeps and concentrates, industrial catalysts, and other industrial waste, and then



recycles those materials, extracting the material containing precious metals for sale downstream to its own customers or trading houses, as what are referred to in the industry as Platinum Group Metals ("PGMs"):

13. Because precious metals are found in varying amounts within each recycled material (and within each category of recycled material), the Debtor developed a sampling method for determining what percentage of the total materials supplied by each supplier contained a precious metal. Because most of its suppliers are themselves industry leaders, suppliers typically deliver a large shipment of metal to be recycled (each, a "Lot"). Each Lot is then processed separately, sampled, and then "assayed." In 2017, the Debtor's installed their own lab at their facility. While the personnel in the lab can roughly determine the PGM content of the material using an energy dispersive XRF, the final and most accurate analysis is conducted

in external laboratories. Some suppliers maintain third-party inspectors on site at Mairec U.S.'s lab to oversee the sampling and assay preparation process. After the testing, the supplier is paid a fixed contractual recovery rate (percentage) based on the determination of the PGM content as per laboratory results.

14. Mairec U.S. then ships, and sometimes sells, the processed material to refineries to further concentrate the PGM material. To offset risk and lock in prices for the PGMs in the constantly volatile PGM market, Mairec U.S. sometimes "hedges" (sells in advance by locking in a price now for a future date) on behalf of their customers on the current market price to trading houses. This risk management strategy helps Mairec U.S. and its customers avoid losing significant profit on extracted PGM materials when the market is down. When the settlement date arrives, Mairec U.S. and its suppliers receive the money from the hedge. If there are surplus metals, or the prices fell, then they will receive market prices for them. If there is a shortfall, or prices rose, then they must pay the market price.

15. Through its state of the art technology and strong reputation, Mairec U.S. grew rapidly, employing over 60 people, and generating over $108 million in revenue in its 2016 fiscal year. Notwithstanding the growing revenues, industry margins were thin.

### B. Prepetition Capital Structure

#### i. Corporate Structure and Equity Holders

16. Mairec Germany owns 100% of the common stock of the Debtor. Mairec Germany is 100% owned by the Maiers.

17. Prior to his resignation, Mikhail Khaimov ("Khaimov") owned 100 shares of preferred stock in Mairec U.S. He is believed to be a dual citizen of Russia and the United

6

States, and a resident of Belgium.[2] He was hired to serve as the President of Mairec U.S. As discussed below, Khaimov, an employee of Mairec U.S., was later granted the small interests pursuant to his demands. The Debtor believes that Khaimov is currently residing abroad.

### ii. Senior Management

18. Since September 2018, Julia Maier served as the President of Mairec U.S., with Michael Zendel as Vice President. They resigned as Officers after my appointment as CRO. Julia and Thomas Maier also resigned from the Board of Directors after Ralph Strayhorn, III, Matthew R. Kahn, and Michael A. Almond were appointed as independent members of the Board.

### iii. Prepetition Indebtedness

19. The Debtor maintains operating and payroll accounts at Wells Fargo Bank, N.A. As of the Petition Date, the operating account had a balance of $8,342,148.00. The Debtor is also waiting to collect on "open settlements" with approximately 20 suppliers.

20. The Debtor utilizes three unsecured lines of credit to satisfy its liquidity needs. The Debtor entered into a $1,200,000 Note with Commerzbank AG on February 25, 2016. The current balance on the Note is $909,000. The Debtor also entered a $5,000,000 Master Promissory Note dated May 4, 2016 with UniCredit Bank AG. The current balance on the Note is $4,994,934. In addition, Commerzbank allowed Mairec U.S. to draw $2,000,000 from Mairec Germany's 12 million EUR line of credit with the bank. The current balance owed from that line is $1,986,490. Mairec Germany also provided $14,800,000 in loans to Mairec U.S. from 2015 to 2018. The Debtor made 13 payments to Mairec Germany, reducing the balance to $9,885,000.

---

[2] Pursuant to a resignation letter (described herein) and subsequent letter dated January 17, 2019 from the Company to Khaimov enclosing a check for the purchase price of the stock, Khaimov transferred the stock to Mairec Germany effective as of October 31, 2018.

7

The Debtor also has equipment leases with Deutsche Leasing USA, Inc. and CIT for certain equipment at the Spartanburg facility.

21. Notably, the Debtor has no assets in Germany, and does not believe any lender maintains a lien on its cash.

22. Prior to the filing of this case, the Debtor did not require access to additional credit facilities because it utilized "Advances" and "Early Settlements" from its customers and trading partners to obtain immediate access to cash rather than waiting for final payment after PGMs were refined and tested again. The process provides liquidity in a somewhat similar fashion to the factoring of receivables.

**II.    Events Leading to the Bankruptcy Filing**

23. Mairec U.S.'s initial wave of success came to an abrupt and unexpected end, which can be attributed to a single series of aberrant events at Mairec U.S.

24. Khaimov tendered a resignation letter to Mairec U.S. on August 30, 2018, which attempted to set the effective date of such resignation as October 31, 2018. Almost immediately thereafter, in September 2018, Mark Hartig, the Controller of Mairec U.S. at the time, reportedly advised 366 International, Inc. ("366"), a large supplier of material to Mairec U.S., that he believed 366 did not receive the correct payment amounts for material delivered and tested at the Debtor's facility. Mr. Hartig alleged, among other things, that certain samples may have been tainted, causing the test results to be wrong, and incorrect payments to 366 for its material.

25. Mairec U.S. took swift and decisive action concerning these allegations. The law firm of Smith, Gambrell & Russell LLP ("SGR") was retained to lead an investigation. As a result of the investigation, the Controller and lab technicians were terminated, and others who may have failed to comply with testing protocols were transferred or fired. New protocols,

8

which include, among other things, (i) limiting the number of authorized personnel permitted to process final samples in the lab, (ii) withdrawing lab access to non-authorized employees, and (iii) producing final samples only on selected days, were instituted. Suppliers and hedging partners were welcomed to audit the facility and the new protocols to gain confidence that Mairec U.S. was once again maintaining the exceptional level of service it established in the industry.

26. On October 23, 2018, a Complaint was filed by 366 against Mairec U.S., Mairec Germany, and Khaimov in the United States District Court for the District of South Carolina seeking damages in excess of $16,000,000 in a case styled *366 Process Service, Inc. v. Mairec Precious Metals U.S., Inc. et al.*, Case No. 18-02874-BHH (D.S.C. Oct. 23, 2018) in connection with the payment dispute (the "Lawsuit"). The Affidavit of the Controller, used in support of a Motion for Prejudgment Attachment, contained no factual assertions that Mairec Germany or the Maiers knew or had any involvement in the circumstances, and the United States District Court denied 366's motion.

27. Before Mairec U.S. even had a chance to respond in the Lawsuit, the mere filing of the case had a devastating impact on Mairec U.S.'s operations. While the loss of 366 as a supplier was inevitable, certain suppliers, trading houses, and hedge partners either terminated their relationship with Mairec U.S. altogether, or modified the terms of that relationship negatively, after the lawsuit was filed without giving Mairec U.S. an opportunity to discuss the actual facts and circumstances.

28. The reputation of Mairec U.S. in this tight-knit industry plunged. As a result, the Debtor was cut off from using the Advances and Early Settlement processes it relies on for its

liquidity to operate, and it lost its supply chain to obtain material to process. It can no longer pay the obligations coming due with suppliers who provided metal.

29. While certain major suppliers and refiners (i) have conducted due diligence, (ii) are seemingly satisfied with Mairec U.S., and (iii) are now transacting business with Mairec U.S. again, others have refused to reengage. Consequently, Mairec U.S. no longer has the short term liquidity or access to capital to continue as a go forward entity without the protections of Chapter 11, and it has no viable option but to seek Chapter 11 relief in this Court to protect and preserve its assets for the benefit of creditors and the estate.

### III. Proposed Restructuring Path

30. The Debtor intends to act quickly to stabilize the company and preserve its value so it can restructure, and/or seek the infusion of new capital or a sale transaction. Indeed, at least four (4) potential purchasers have already contacted Mairec U.S.'s professionals about a possible transaction. Based on cash flow projections over the next 13 weeks attached hereto as **Exhibit A**, the Debtor's existing cash on hand, receivables, ongoing operations are sufficient for the company to continue operating during this Chapter 11 process long enough to conduct a fulsome marketing process without the need to obtain postpetition financing.

31. Concurrently with the filing of this case, the Debtor filed a number of First-Day Motions. The Debtor anticipates that the Court will conduct a hearing soon after the commencement of this case (the "First-Day Hearing"), at which time the Court will hear the First-Day Motions.

32. An important and critical element to the success of this chapter 11 case will be the entry of orders granting the relief requested in each of the First-Day Motions. Generally, the First-Day Motions are designed to facilitate: (a) the continuation of business operations without

interruption, (b) maintenance of employee morale and confidence; and (c) establishment of certain other administrative procedures to promote a smooth transition into chapter 11. The factual background in support of each First-Day Motion is provided below:

**IV.    Facts in Support of First Day Motions**

    **A. Cash Management Motion**

33.    Through the *Motion for Order Authorizing (I) the Debtor to (A) Maintain Existing Corporate Bank Accounts and Cash Management System, and (B) Use Existing Business Forms and Records, (II) Waiving the Requirements of 11 U.S.C. § 345(b) of the Bankruptcy Code, (III) Scheduling a Final Hearing, and (IV) Granting Certain Related Relief* (the "Cash Management Motion"), the Debtor seeks entry of an order (I) authorizing the Debtor to (A) continue to maintain its existing cash management system and (B) maintain existing bank accounts and business forms, and in connection with the foregoing, granting the Debtor a waiver of certain bank account and related requirements of the U.S. Trustee to the extent that such requirements are inconsistent with the Debtor's practices in connection with its existing cash management system; (II) authorizing, but not directing, the Debtor, in its sole discretion, to pay or otherwise satisfy all prepetition costs and fees associated with customer credit and debit card transactions; (III) waiving the requirements of § 345(b) of the Bankruptcy Code with respect to the Debtor's deposit practices; and (IV) granting related relief.

**The Debtor's Bank Accounts and Cash Management System**

34.    In the ordinary course of business, the Debtor maintains several bank accounts (the "Bank Accounts") with Wells Fargo Bank, N.A. ("Wells Fargo") that operate as part of a cash management system (the "Cash Management System").

11

35. Through the Bank Accounts, the Debtor collects, transfers, and disburses funds generated from its revenues and incoming payments. The Debtor routinely deposits, withdraws, and otherwise transfers funds to, from, and between the Bank Accounts by various methods including check and wire transfer.

36. The Debtor seeks authority to continue to operate the Cash Management System, on a post-petition basis, as described in the Cash Management Motion. The Cash Management System constitutes an ordinary course and essential business practice that provides significant benefit to the Debtor, including, among other things, the ability to control corporate funds, ensure the maximum availability of funds where necessary, reduce borrowing costs and administrative expenses by facilitating the movement of funds, and the development of more timely and accurate account balance information. Disrupting its current Cash Management System would impair the Debtors' ability to optimize their business performance at this critical time as it begins the Chapter 11 process. Maintenance of the existing Cash Management System will prevent undue disruption to the Debtor's business operations while protecting the Debtor's cash for the benefit of its estate. Requiring the Debtor to change its Cash Management System at this critical time would cause unnecessary disruption to the Debtor and its business affairs. I believe that maintenance of the existing Cash Management System is in the best interests of the Debtor and its estate.

37. The Debtor also requests that no Bank that honors a prepetition check or other item drawn on any account that is the subject of the Cash Management Motion (a) at the direction of the Debtor, (b) in a good faith belief that the Court has authorized such prepetition check or item to be honored, or (c) as a result of an innocent mistake made despite implementation of reasonable item handling procedures, be deemed to be liable to the Debtor or

to its estate on account of such prepetition check or other item being honored post-petition or otherwise in violation of the Proposed Order (when and if entered). I believe that such flexibility accorded to the Banks is necessary to induce the Banks to continue providing cash management services without additional credit exposure.

### Maintenance of the Debtor's Existing Checks and Business Forms

38. In the ordinary course of business, the Debtor uses a variety of business forms. To minimize the expense to the estate and to avoid any confusion with suppliers, customers, and employees, the Debtor respectfully requests that the Court authorize the Debtor to continue to use all business forms, including without limitation, letterhead, customer program forms, purchase orders, contracts, and invoices (collectively, the "Business Forms"), as such forms were used by the Debtor immediately prior to the Petition Date, without reference to the Debtor's status as Debtor in possession. Granting this relief will allow the Debtor to avoid the cost and delay of ordering new business forms. Upon depletion of the current stock of forms and checks, the Debtor will obtain new checks and forms that indicate the debtor-in-possession status.

39. I believe that the transition to Chapter 11 will be more orderly, with a minimum of harm to operations, if all Bank Accounts are continued following the Petition Date with the same account numbers. By preserving business continuity and avoiding the disruption and delay to the Debtor's collection and disbursement procedures that would necessarily result from closing the Bank Accounts and opening new accounts, all parties-in-interest will be best served.

40. The Debtor's ability to manage collections and track receipts and disbursements using its existing Bank Accounts and centralized Cash Management System is critical to its operations and maximizing the value of the Debtor's bankruptcy estate. During the pendency of

the bankruptcy case, the Debtor intends to fund operations from existing cash and postpetition revenues, all of which revenues will run through its Cash Management System.

41. I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor's estate, its creditors, and all other parties-in-interest, and will enable the Debtor to continue to operate its business in chapter 11 without disruption, and monitor and control its cash receipts and disbursements efficiently.

### B. Utilities Motion

42. Through the *Motion for Order (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services on Account of Prepetition Invoices, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures for Requests for Additional Adequate Assurance of Payment* (the "Utilities Motion"), the Debtor seeks entry of an order (I) prohibiting Utility Provides (as defined below) from altering, refusing, or discontinuing services to the Debtor, (II) deeming the Utility Providers adequately assured of payment, (III) establishing procedures for determining requests from Utility Providers for additional adequate assurance of payment, and (IV) granting related relief.

43. In the normal course of business, the Debtor has relationships with certain utility companies (each, a "Utility Provider" and collectively, the "Utility Providers") for the provision of electricity, natural gas, water, sewer, telephone, internet, television, waste management, and other similar utility services (collectively, the "Utility Services"). On average, the Debtor pays approximately $21,806.00 per month on account of Utility Services.

44. Because uninterrupted Utility Services are critical to the Debtor's ongoing recycling operations, the Debtor, through the Utility Motion and pursuant to §§ 105(a) and 366

of the Bankruptcy Code, seeks to establish an orderly process for providing adequate assurance of payment to the Utility Providers without jeopardizing the Debtor's business operations.

45. In general, the Debtor has maintained a [good] payment history with the Utility Providers and has made payments on a regular and timely basis. To the best of the Debtor's knowledge, there are no material defaults or arrearages with respect to undisputed invoices for prepetition Utility Services as of the Petition Date. The Debtor intends to pay any postpetition obligations to the Utility Providers in a timely fashion and in the ordinary course. The Debtor has budgeted for those payments and believes that its cash on hand and cash otherwise available to the Debtor will be sufficient to satisfy obligations for Utility Services in the ordinary course on a postpetition basis in a manner consistent with the Debtor's prepetition practice.

46. As adequate assurance of payment for future services to the Utility Providers, the Debtor proposes to deposit an aggregate amount of $10,903.00 into a newly created, segregated, non-interest-bearing account (the "Adequate Assurance Deposit"), within twenty (20) days of the Petition Date. The amount of the Adequate Assurance Deposit equals approximately 50% of the Debtor's estimated cost of its monthly utility consumption.

47. The Debtor believes it is current on all of its utility payments. The Debtor submits that the Adequate Assurance Deposit, in conjunction with the Debtor's ability to pay for future Utility Services in the ordinary course of business, is sufficient to satisfy the requirements of § 366 of the Bankruptcy Code (the "Proposed Adequate Assurance"). Nonetheless, if any Utility Provider believes additional adequate assurance is required, it may request such assurance pursuant to the procedures described below.

48. To address the right of any Utility Provider under § 366(c)(2) of the Bankruptcy Code to seek additional adequate assurance satisfactory to it, the Debtor proposes the following procedures (the "Additional Adequate Assurance Procedures"):

   a. Within two (2) business days of the date the Interim Order is entered, the Debtor will mail a copy of the Interim Order to the Utility Providers on the Utility Providers List.

   b. If a Utility Provider is not satisfied with the Proposed Adequate Assurance and desires additional assurance of payment, it must serve a request (an "Additional Assurance Request") upon (i) the Debtor: Mairec Precious Metals U.S., Inc., Attn: David Baker, CRO, 230 Old Converse Rd., Spartanburg, South Carolina, 29307; and (ii) proposed counsel to the Debtor: Cole Schotz P.C., Attn: Gary H. Leibowitz, 300 E. Lombard St., Suite 1450, Baltimore, Maryland, 21202 (together, the "Notice Parties").

   c. Any Additional Assurance Request must: (i) be made in writing; (ii) set forth the location(s) for which Utility Services are provided and the relevant account number(s); (iii) include a summary of the Debtor's payment history relevant to the affected account(s), including any security deposits, prepayments, or other security held by the requesting Utility Provider; (iv) set forth why the Utility Provider believes the Proposed Adequate Assurance is not sufficient adequate assurance of payment; and (v) specify the nature and amount of assurance of payment that would be satisfactory to the Utility Provider.

   d. Upon the Notice Parties' receipt of any Additional Assurance Request at the addresses set forth above, the Debtor shall promptly negotiate with such Utility Provider to resolve such Utility Provider's Additional Assurance Request.

   e. The Debtor may, in its discretion, resolve any Additional Assurance Request by mutual agreement with the Utility Provider and without further order of the Court or notice, and may, in connection with any such agreement, in its discretion, (i) provide the Utility Provider with additional adequate assurance of payment in a form satisfactory to the Utility Provider, including, but not limited to, cash deposits, prepayments, and/or other forms of security, without further order of the Court, if the Debtor believes such additional assurance is reasonable, and (ii) withdraw the corresponding funds deposited in the Adequate Assurance Deposit and allocated to the settling Utility Provider.

   f. If the Debtor determines that an Additional Assurance Request is not reasonable and is not able to reach an alternative resolution with the applicable Utility Provider within a reasonable period of time, the Debtor shall, upon reasonable notice, calendar the matter (an "Adequate Assurance Dispute") for the next regularly scheduled case hearing, unless another hearing date is agreed to by the

parties or ordered by the Court, to determine the adequate of assurance of payment pursuant to § 366(c)(3) of the Bankruptcy Code.

g. Pending resolution of any Additional Assurance Dispute, any such Utility Provider shall be restrained from altering, discontinuing, or refusing service to, or discriminating against, the Debtor on account of unpaid charges for prepetition services, the Debtor's bankruptcy filings or any objections to the Proposed Adequate Assurance, or requiring the Debtor to furnish any additional deposit or other security for the continued provision of services.

h. Upon the termination of any one or more Utility Services, the Debtor may, in its discretion and without further order of the Court, reduce the Adequate Assurance Deposit by an amount not exceeding, for each terminated Utility Service, the lesser of (i) the estimated two-week utility expense for such Utility Services and (ii) the amount of the Adequate Assurance Deposit then attributable to the applicable Utility Provider.

49. I believe that the Additional Adequate Assurance Procedures provide a fair, reasonable, and orderly mechanism for the Utility Providers to seek additional adequate assurance while temporarily maintaining the status quo for the benefit of all stakeholders.

50. I believe that the relief requested in the Utilities Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its business in chapter 11 without disruption.

C. **Wage Motion**

51. By the *Debtor's Motion for Interim and Final Orders Under Bankruptcy Code Section 105(a), 363(b), 363(c), 507(a), and 541 (A) Authorizing Payment of Certain Pre-Petition Wages, Salaries, Employee Expenses, Commissions and other Employee Benefits and Payment for Related Taxes and Withholdings, (B) Authorizing Continuation of Employee Benefit Programs, and (C) Authorizing Financial Institutions to Honor All Checks Presented for Payment Related to the Foregoing* (the "Wage Motion"), the Debtor seeks entry of an order (a) authorizing payment of certain pre-petition wages, salaries, employee expenses, commissions and other employee benefits and payment of related taxes and withholdings, (collectively, and as

further described below, the "Pre-Petition Employee Obligations"); (b) authorizing continuation of employee benefits programs (collectively, and as further described below, the "Employee Benefit Programs"); and (c) authorizing financial institutions to honor all checks presented for payment related to the foregoing.

52. As of the Petition Date, the Debtor has approximately 50 employees, all of which are full-time (the "Employees"). Three of the Employees are Managers, three are considered "Office Staff," and the rest are Associates of the Company.

53. The Employees perform a variety of critical functions, including sales, customer service, information technology, merchandising and product strategy, production, logistics, maintenance, lab, warehouse, administrative, accounting, finance, management, and similar tasks. The skills and experience of the Employees, as well as their relationships with customers and vendors, and knowledge of the Debtor's business and newly improved protocols are essential to the Debtor's ongoing operations and ability to preserve the going concern value of the Debtor's assets pending a potential sale of the Company.

54. By the Wage Motion, the Debtor seeks entry of an order authorizing it, in its discretion, to pay, continue or otherwise honor all Pre-Petition Employee Obligations to or for the benefit of all current and former Employees, including, but not limited to, all unpaid compensation, paid time off, deductions, payroll taxes, reimbursable expenses, the costs associated with the employee benefit programs, including all premiums, and all administrative and third-party costs associated with the foregoing.

55. The Debtor also seeks authority to continue its Employee Benefit Programs and 401k plan in the ordinary course of business and to pay all associated administrative and third-party costs. The Debtor further seeks an order directing its banks to honor pre-petition

18

payments, including checks, issued on account of Pre-Petition Employee Obligations, Employee Benefit Programs, workers' compensation insurance, and the 401k plan.

56.  The majority of the Debtor's Employees rely on their compensation and benefits to satisfy daily living expenses.  The Debtor's Employees will be exposed to significant financial difficulties if the Debtor is not permitted to honor its Employee Obligations.  Absent the relief requested in the Wage Motion, morale and loyalty will undoubtedly sink to crippling lows and may cause a wave of Employees to seek alternate employment opportunities at a critical phase of the Chapter 11 case.  Such result undoubtedly would destabilize the Debtor's operations and ability to generate revenue and service customers during a time of perceived uncertainty.  The distraction caused by the loss of valuable Employees or low morale would be counterproductive to the Debtor's efforts to alleviate the stress of a Chapter 11 filing on its business and preserve going concern value while a sale of their business assets is pursued.  Therefore, the Debtor requests that the Court grant the Wage Motion.

**III.  Conclusion.**

57.  Approval of the First-Day Motions filed by Mairec U.S. is crucial to its ability to continue its business.  Without the relief requested, Mairec U.S. would be forced to cease operations and would be unable to pursue its reorganization efforts.  The requested relief will also assist Mairec U.S. in maintaining employee morale, retaining employees and establishing certain other administrative procedures to promote a smooth transition into, and eventually out of, chapter 11.

Dated: February 28, 2019                    /s/ David Baker
                                            David Baker, Chief Restructuring Officer